### NEW YORK STATE BAR ASSOCIATION, Plaintiff,

v.

### FEDERAL TRADE COMMISSION, Defendant.

### American Bar Association, Plaintiff,

v.

### Federal Trade Commission, Defendant.

### Civil Action Nos. 02–810 (RBW), 02–1883(RBW).

United States District Court, District of Columbia.

Aug. 11, 2003.

Warren L. Dennis, Proskauer Rose, LLP, Washington, DC, Susan Brinkerhoff, Alexandria, VA, David L. Roll, Steptoe & Johnson LLP, Washington, DC, Geoffrey C. Hazard, Jr., Swarthmore, PA, Rhonda M. Bolton, Steptoe & Johnson LLP, Washington, DC, for plaintiff.

Brian J. Sonfield, Michael Daniel Bergman, John F. Daly, Washington, DC, for defendants.

Jeffrey Todd Green, Sidley Austin Brown & Wood, Washington, DC, for movants.

Margaret Colgate Love, Ashbill Moffitt & Boss Chartered, Washington, DC, for Amicus.

## MEMORANDUM OPINION

WALTON, District Judge.

### I. Background

The Federal Financial Modernization Act, otherwise known as the Gramm–Leach–Bliley Act (the "GLBA" or the "Act"), was enacted by Congress and signed into law in November 1999. The purpose underlying the GLBA is "to enhance competition in the financial services industry by providing a prudential framework for the affiliation of banks, securities firms, insurance companies, and other financial service providers...." H.R. Conf. Rep. No. 106–434, at 245 (1999), *reprinted in* 1999 U.S.C.C.A.N. 245, 245. Realizing that the adoption of the Act would afford such financial institutions even greater access to consumers' personal financial information, *see* H.R. Rep. 106–74, pt. 3, at 106–07 (June 15, 1999) ("As a result of the explosion of information available via elec-

tronic services such as the Internet, as well as the expansion of financial institutions through affiliations and other means as they seek to provide more and better products to consumers, the privacy of data about personal financial information has become an increasingly significant concern of consumers."), Congress granted broad privacy protections to consumers, giving them the power to choose whether their personal information will be shared by financial institutions.

Title V of the GLBA, 15 U.S.C. §§ 6801–6809, contains a number of privacy provisions and reflects "the policy of Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its consumers and to protect the security and confidentiality of those consumers' nonpublic personal information[,]" 15 U.S.C. § 6801(a). To implement this policy, Congress required that financial institutions provide consumers, "[a]t the time of establishing a customer relationship ... and not less than annually during the continuation of such relationship," a privacy notice detailing their practices with respect to disclosing and protecting nonpublic personal information. *See* 15 U.S.C. § 6803. In addition, Congress mandated that prior to disclosing any nonpublic personal information, the financial institution must provide a consumer with a nondisclosure or "opt out" option, which if exercised, would prohibit the financial institution from disseminating the consumers' nonpublic personal information to non-affiliated third parties. *See* 15 U.S.C. § 6802(b). And the Federal Trade Commission ("FTC" or "the Commission") maintains that "[a]ll financial institutions subject to the FTC's jurisdiction—including lawyers—will have to comply with these rules beginning on May 23, 2003."[1] Reply Memorandum in Support of Defendant's Motion to Dismiss ("FTC Reply to ABA") at 11 n. 10.

Following the passage of the GLBA, and the issuance of related regulations by the FTC, *see* 16 C.F.R. §§ 313.1–18, the plaintiffs, the New York State Bar Association ("NYSBA") and the American Bar Association ("ABA"), became aware through "report[s] in the professional and trade regulation press" that the FTC had decided that attorneys who were engaged in certain "financial activities" as part of their legal practices would be subject to the GLBA and its privacy provisions.[2] New York State Bar Association Complaint ("NYSBA Compl.") ¶ 37; *see* American Bar Association Complaint ("ABA Compl.") ¶ 18. In response to the FTC's decision, the plaintiffs and numerous other bar associations across the nation sent letters to the FTC formally requesting that the practice of law be exempted from the GLBA's privacy provisions. *See* NYSBA Compl. ¶¶ 39–41; ABA Compl. ¶ 19. On April 8, 2002, the Director of the FTC's Bureau of Consumer Protection sent a letter to the ABA, which stated:

> We have carefully considered your concerns, and recognize the issues you raised regarding the application of the

---

**1.** In a June 30, 2003, letter written in response to a conference call with the Court's law clerk regarding concerns raised by the plaintiffs, the FTC stated that it did "not intend to bring enforcement actions under these GLBA provisions against lawyers for any action or inaction by lawyers in the period of time prior to the Court's rulings on the FTC's motions to dismiss...." *See* FTC June 30, 2003 Letter.

**2.** The Court notes that the plaintiffs do not challenge the FTC's authority to promulgate regulations to implement the GLBA, *see* 15 U.S.C. § 6804 (providing that the FTC has regulatory authority to prescribe regulations as may be necessary to implement the GLBA), nor the existing regulations themselves.

GLB Act to attorneys at law. However, there are significant questions as to the legal authority of the Commission to grant the exemption you request.

As you know, the GLB Act itself states that entities engaged in 'financial activities' are subject to the Act. Although the Commission has express authority under the GLB Act to grant exceptions, that authority is limited to providing exceptions to the requirements of Section 502 [15 U.S.C. § 6802]. The Act does not provide the Commission with express authority to grant exemptions from the other provisions of the GLB Act, including the initial and annual notice provisions. *See* GLB Act § 504(b), 15 U.S.C. [§ ] 6804(b).[3]

Memorandum of the American Bar Association in Opposition to the FTC's Motion to Dismiss the Complaint ("ABA Mem."), Exhibit ("Ex.") A; *see* NYSBA Compl. ¶¶ 45–50. The plaintiffs filed this action shortly after receipt of this letter seeking a judgment declaring that: (1) the FTC's decision that attorneys engaged in the practice of law are covered by the GLBA is in excess of the FTC's statutory authority; (2) the FTC's decision that attorneys engaged in the practice of law are covered by the GLBA is an arbitrary and capricious agency action; and (3) the FTC's refusal to grant attorneys engaged in the practice of law an exemption from the GLBA also constitutes arbitrary and capricious agency action.[4] This matter is now before the Court on the defendant's motions to dismiss the plaintiffs' complaints for failure to state claims upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon consideration of the parties' submissions and for the reasons set forth below, the Court will deny the defendant's motions to dismiss the complaints.[5]

3. The Court notes that there is a pending bill before Congress to formally exempt attorneys from the privacy provisions of the GLBA. *See* H.R. 781, 108th Cong. (2003) (unenacted).

4. The Court is authorized to award declaratory relief in this case under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

5. As a preliminary matter, the Court notes that the FTC has not asserted any concerns about the justiciability of this matter on the grounds that there has been no "final agency action." In *Carter/Mondale Presidential Committee, Inc. v. Federal Election Commission,* 711 F.2d 279 (D.C.Cir.1983), the District of Columbia Circuit discussed the Supreme Court's opinions in *FTC v. Standard Oil Co.,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) and *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and stated the following about what constitutes "final agency action":

First, the Court in *Standard Oil* noted that the cases dealing with judicial review of administrative actions have interpreted the finality element in a pragmatic way and taken a flexible view of the matter. The Court then noted the indicia of finality on which it had relied in *Abbott Laboratories:* the definitive statement of an agency's position; the action should have a direct and immediate ... effect on the day-to-day business of the complaining parties; the action should have the status of law; immediate compliance with the terms should be expected; and the question should be a legal one fit for judicial resolution.

711 F.2d at 285–86 (quoting *Standard Oil,* 449 U.S. at 239–40, 101 S.Ct. 488 (quoting *Abbott Labs.,* 387 U.S. at 151–54, 87 S.Ct. 1507)) (internal citations and quotations omitted). Clearly the FTC's April 8, 2002, Opinion Letter, in conjunction with its position that "[a]ll financial institutions subject to the FTC's jurisdiction—including lawyers—will have to comply with these rules beginning on May 23, 2003[,]" FTC Reply to ABA at 11 n. 10, satisfies this standard. *See* ABA Compl. ¶¶ 21–22 (stating that "[t]he FTC letter of April 8, 2002, constitutes final agency action" and "[t]he FTC letter of April 8, 2002 signals the agency's enforcement intentions regarding lawyers...").

## II. Standards of Review

### (A) Motion to Dismiss under Rule 12(b)(6)

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiffs and must grant the plaintiffs the benefit of all inferences that can be derived from the alleged facts. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). However, the Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. *Kowal*, 16 F.3d at

1276. In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C.Cir.1997).[6] The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

### (B) The Plaintiffs' APA Claims

All of the plaintiffs' claims in this case challenge the FTC's interpretation of the

---

6. In this case, the Court has reviewed the FTC's April 8, 2002, Opinion Letter, which is not only repeatedly referenced in the plaintiffs' complaints, but to a large extent is incorporated in the complaints themselves. While the Court initially had concerns about considering the Opinion Letter itself, which is attached as an exhibit to the ABA's opposition to the defendant's motion to dismiss, without converting the motion into one for summary judgment, that concern was alleviated because the Opinion Letter, which is central to the plaintiffs' claims, is not only referenced in the complaints, but all of the substantive content of the Opinion Letter is incorporated into the plaintiffs' complaints. *See Cooper v. Pickett*, 137 F.3d 616, 622–23 (9th Cir.1997) ("[A] document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned ... [D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.") (quoting *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994)) (quotations and citations omitted in the original); *Torello v. U.S. Office Products Co.*, 251 F.Supp.2d 58, 66–67 (D.D.C.2003) ("While the court must generally limit its review to facts alleged within the complaint, the court may consider ... documents that are both referenced in the com-

plaint and central to the plaintiff's claim.") (citing *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C.Cir.1979) ("[W]hen passing on a motion attacking the legal efficacy of the plaintiff's statement of his claim, the court may properly look beyond the complaint only to those items in the record of the case or to matters of general public record. We accordingly confine ourselves largely to the contents of the complaint, including prominently the text of the [agency's] letter-decision incorporated therein....."); *Lipton v. MCI Worldcom, Inc.*, 135 F.Supp.2d 182, 186 (D.D.C.2001) ("[T]he court may consider the defendants' supplementary material without converting the motion to dismiss into one for summary judgment. This Court has held that 'where a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment.' ")). Therefore, while a copy of the April 8, 2002, Opinion Letter was not attached as an exhibit to the plaintiffs' complaints, the Court finds it appropriate to review the entire text of the Opinion Letter because all the substantive portions are contained in the plaintiffs' complaints, the Opinion Letter is central to the plaintiffs' claims, the portions of the Opinion Letter not contained in the complaints were reviewed solely for their contextual value, and its authenticity is undisputed.

GLBA pursuant to the Administrative Procedure Act ("APA"). *See* NYSBA Compl. ¶ 15; ABA Compl. ¶¶ 29–31. Agency action under the APA can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C). The plaintiffs bring challenges pursuant to both of these sections of the APA.

### (1) *The FTC's Interpretation of the GLBA*

A challenge to an agency's construction of a statute that it administers is subject to the standard of review articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the plaintiffs have challenged the FTC's interpretation of the GLBA's applicability to lawyers engaged in the practice of law pursuant to 5 U.S.C. § 706(2)(C) of the APA. Applying the familiar *Chevron* test, the Court must first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. 2778. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. And, in making such an assessment, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Id.* at 844, 104 S.Ct. 2778. The *Chevron* Court explained that

the principle of deference to administrative interpretations[ ] has been consis-

tently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.

*Id.* (internal quotation omitted). Thus, if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [a court] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 845, 104 S.Ct. 2778.

However, in *United States v. Mead Corporation*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), the Supreme Court noted that "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances[.]" *Id.* at 228, 121 S.Ct. 2164. In this case, the Court is asked to review agency action which is contained in an opinion letter. In *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), the Court stated that

an interpretation contained in an opinion letter, [is] not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking [and thus i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.

*Id.* at 587, 120 S.Ct. 1655 (citations omitted). When reviewing opinion letters, "courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Mead,*

533 U.S. at 228, 121 S.Ct. 2164 (citations omitted). "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)) (internal quotation marks omitted). Interpretations that are contained in opinion letters are " 'entitled to respect' under the Supreme Court's decision in *Skidmore* ... but only to the extent that those interpretations have the 'power to persuade[.]' " *Christensen*, 529 U.S. at 587, 120 S.Ct. 1655 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161).

### (2) *The FTC's Decision–Making Process and the Rationale Underlying the Action it Took*

Additionally, the plaintiffs make two separate challenges to the FTC's decision-making process under Section 706(2)(A) of the APA. The plaintiffs challenge the FTC's interpretation of the GLBA's applicability to attorneys engaged in the practice of law and the FTC's refusal to grant attorneys an exemption from the GLBA as arbitrary and capricious agency actions. In *Individual Reference Services Group, Inc. v. FTC*, 145 F.Supp.2d 6 (D.D.C.2001), *aff'd, Trans Union LLC v. FTC*, 295 F.3d 42 (D.C.Cir.2002), another member of this Court, in considering a challenge to FTC regulations implementing the GLBA, stated that "[w]hile challenges under § 706(2)(C)—which follow the test set forth in *Chevron*—are directed primarily at the decision of the agency, § 706(2)(A) actions focus mainly on the decision-making process and rationale behind agency action." 145 F.Supp.2d at 25 (citing *Michigan v. EPA*, 213 F.3d 663, 682 (D.C.Cir.

2000), *cert. denied sub nom.*, 532 U.S. 903, 121 S.Ct. 1225, 149 L.Ed.2d 135 (2001)). The *Individual Reference* Court noted that "[w]hile the standards of review for these types of challenges overlap, they are not identical: an agency's interpretation may survive analysis under *Chevron* but still be struck down as arbitrary and capricious." 145 F.Supp.2d at 25 (citing *American Petroleum Inst. v. EPA*, 216 F.3d 50, 57–58 (D.C.Cir.2000); *Michigan v. EPA*, 213 F.3d at 682). The scope of review under the arbitrary and capricious standard

is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, [a court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation of its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks and citations omitted). The *State Farm* Court noted that a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp. Inc. v. Arkansas–*

*Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

## III. *Legal Analysis*

As this Court mentioned above, the GLBA's privacy provisions were enacted to regulate the use of consumers' personal financial information by "financial institutions." *See* 15 U.S.C. § 6801(a). While the purpose underlying the GLBA may seem straightforward, the construction of the term "financial institution" as used in the Act is not, which is the primary basis for the parties' dispute. The dispute between the parties requires the Court to resolve whether attorneys who are engaged in the practice of law and provide services that are considered by the FTC to be financial in nature qualify as "financial institutions" and are therefore subject to the privacy provisions of the GLBA. In addressing whether the FTC's interpretation of the GLBA's applicability to attorneys is valid, the Court will consider the plaintiffs' APA challenges under both 5 U.S.C. § 706(2)(A) (stating that agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law") and 5 U.S.C. § 706(2)(C) (stating that agency action may be set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

### (A) *The Chevron Challenge*

Under the well known *Chevron* test, which is applicable to APA challenges under § 706(2)(C), the Court must first examine "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. The District of Columbia Circuit recently noted that "[i]n this first analytical step, the courts use 'traditional tools of statutory interpretation-text, structure, purpose, and legislative history.'" *Citizens Coal Council v. Norton,* 330 F.3d 478, 481 (D.C.Cir.2003) (quoting *Pharm. Research & Mfrs. of Am. v. Thompson,* 251 F.3d 219, 224 (D.C.Cir.2001)).

### (1) *The Plain Language of the GLBA*

Because the "first traditional tool of statutory construction focuses on the language of the statute[,]" *Bell Atlantic Telephone v. FCC,* 131 F.3d 1044, 1047 (D.C.Cir.1997), this Court will begin its analysis by examining the text of the GLBA. In enacting the GLBA, Congress was clear in the plain language of the statute that the privacy provisions contained in Title V, 15 U.S.C. §§ 6801–6809, only apply to what Congress defined as a "financial institution." The FTC takes the position that if an attorney provides real estate settlement, tax-planning, or tax-preparation services, then the attorney qualifies as a "financial institution" under the GLBA. Defendant's Motion to Dismiss [the NYSBA's Case] for Failure to State a Claim Upon Which Relief Can Be Granted Pursuant to Fed.R.Civ.P. 12(b)(6), Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted Pursuant to Fed. R.Civ.P. 12(b)(6) ("Def.'s Mem. in NYSBA Case") at 2–3; Defendant's Motion to Dismiss [the ABA's Case] for Failure to State a Claim Upon Which Relief Can Be Granted Pursuant to Fed.R.Civ.P. 12(b)(6), Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted Pursuant to Fed. R.Civ.P. 12(b)(6) ("Def.'s Mem. in ABA Case") at 2–3. This is the FTC's interpretation because the GLBA's scope extends to institutions that are in the business of engaging in those financial activities listed in the Bank Holding Company Act of 1956 ("BHCA"), 12 U.S.C. § 1843(k), which itself incorporates a Federal Reserve System regulation, 12 C.F.R. § 225.28 ("Regu-

lation Y"), that regulates banking related activities. Def.'s Mem. in NYSBA Case at 8–11; Def.'s Mem. in ABA Case at 7–11.

The FTC's interpretation of the GLBA's applicability to attorneys seems to ignore the plain language of the statute's regulatory scheme. The text of the GLBA defines a "financial institution" as "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12."[7] 15 U.S.C. § 6809(3)(A). Thus, for the GLBA to be applicable to attorneys, the Court must first determine whether an attorney is considered an institution and, if so, whether attorneys are in "the business of ... engaging in [the] financial activities [listed] in section 1843(k) of Title 12[?]" *Id.*

### (a) *Is an Attorney an Institution?*

The GLBA does not contain a definition of the term "institution" and therefore the Court must turn to the common definitions of this term in order to determine whether an attorney can qualify as an institution. An institution is commonly defined as "an established organization or corporation (as a college or university) esp[ecially] of a public character[.]" Merriam–Webster's Collegiate Dictionary 606 (10th ed.1996); *see also* Black's Law Dictionary 801 (7th ed.1999) ("[a]n established organization, esp[ecially] one of a public character....."); Webster's Third New International Dictionary 1171 (1993) ("an established society or corporation: an establishment or foundation esp[ecially] of a public character"). It is clear that attorneys do not fall within these common definitions of what constitutes an "institution." While entities such as Citibank, Inc. and Morgan Stanley Dean Witter & Co. are clearly institutions, the Court is simply unable to conclude on the record now before it that all attorneys who engage in Regulation Y activities fall within the definition of an "institution." Even applying the broadest possible interpretation of the dictionary definitions of "institution," it would be a distortion for the Court to conclude, for example, that unincorporated solo practitioners, or for that matter any solo practitioner, fall under these definitions. And this is the effect of the FTC's interpretation, as nearly half of the practicing bar in this country is comprised of solo practitioners and those in firms of five lawyers or less, *see* Brief of State and Local Bar Associations as Amici Curiae in Support of Plaintiff ABA's Memorandum in Opposition to the FTC's Motion to Dismiss the Complaint ("State & Local Bar Amici I") at 3, and surely many of these attorneys engage in Regulation Y activities.[8]

### (b) *Are Attorneys Engaged in the Business Of Financial Activities as Defined by the GLBA?*

As this Court stated above, the GLBA defines a "financial institution" as "any

---

**7.** The FTC has promulgated a regulation entitled Privacy of Consumer Financial Information, 16 C.F.R. § 313.3, which defines a "financial institution" as "any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(k)). An institution that is significantly engaged in financial activities is a financial institution." *Id.*

**8.** Amici curiae filing this Brief include: the Arizona Bar, the Arkansas Bar Association, the Atlanta Bar Association, the Beverly Hills Bar Association, the Connecticut Bar Association, the Cuyahoga County Bar Association, the Florida Bar, the Illinois State Bar Association, the Lawyer's Club of Los Angeles County, the Maryland State Bar Association, the Nashville Bar Association, the New Orleans Bar Association, the Oklahoma Bar Association, the Pennsylvania Bar Association, the South Carolina Bar, the Tennessee Bar Association, the Vermont Bar Association, the Virginia Bar Association, and the West Virginia Bar Association.

institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." 15 U.S.C. § 6809(3)(A). Section 1843(k) of Title 12, or the BHCA, regulates the activities of bank holding companies [9] and states that

a financial holding company may engage in ... and may acquire and retain the shares of any company engaged in any activity, that the [Federal Reserve] Board ... determines (by regulation or order)—

(A) to be financial in nature or incidental to such financial activity; or

(B) is complementary to a financial activity and does not pose a substantial risk to the safety or soundness of depository institutions or the financial system generally.

12 U.S.C. § 1843(k)(1). The BHCA lists several types of activities that are considered financial in nature, including "any activity that the Board has determined, by order or regulation that is in effect on November 12, 1999, to be so closely related to banking or managing or controlling banks as to be a proper incident thereto...." 12 U.S.C. § 1843(k)(4)(F). And the FTC notes that in Regulation Y, the Board of Governors of the Federal Reserve System ("Federal Reserve Board" or "FRB") includes as financial activities those that "are so closely related to banking or managing or controlling banks as to be a proper incident thereto" the following: "[p]roviding real estate settlement services" and "[p]roviding tax-planning and tax-preparation services to any person." 12 C.F.R. § 225.28(b)(2)(viii), (6)(vi). Accordingly, the FTC concludes that anybody, including attorneys engaged in the practice of law, who provide such services are covered by the GLBA.

In *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), the Supreme Court stated that "[i]n determining whether Congress has specifically addressed the question at issue [, when conducting a *Chevron* analysis], a reviewing court should not confine itself to examining a particular statutory provision in isolation. [This is because t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Id.* at 132, 120 S.Ct. 1291 (citing *Brown v. Gardner*, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context.")). As set forth below, not only do attorneys appear to fall outside the definition of "institutions" within the meaning of the GLBA, but the practice of law does not appear to be a financial activity within the meaning of the BHCA and Regulation Y.

### (i) *The Underlying Purpose of the BHCA and Regulation Y*

By incorporating the BHCA, and therefore Regulation Y, into its definition of what constitutes a "financial institution," Congress seems to have intended the GLBA to reach financial institutions engaged in both typical banking activities and also their non-banking activities that are "so closely related to banking ... as to be properly incident thereto ... [,]" 12 C.F.R. § 225.28(a). The BHCA "generally prohibits bank holding companies from owning shares in companies other than banks, [but] allows such ownership where the activities of the non-bank affiliate have been found by the Federal Reserve Board to be 'so closely related to banking or managing or controlling banks as to be a

---

**9.** A "bank holding company" is defined, with limited exceptions, as "any company which has control over any bank or over any company that is or becomes a bank holding company by virtue of [Chapter 17 of Title 12]." 12 U.S.C. § 1841(a)(1).

proper incident thereto.'" *Nat'l Courier Ass'n v. Bd. of Governors of the Fed. Reserve Sys.*, 516 F.2d 1229, 1232 (D.C.Cir. 1975) (quoting 12 U.S.C. § 1843(c)(8)). In deciding whether an activity is "closely related to banking," the District of Columbia Circuit has noted that "[t]his is a question that asks only whether the activities in question are generally of a kind that Congress, having concluded that 'banking and commerce should remain separate,' forbade bank holding companies to engage in, without regard to the merits of such engagement in a particular case." *Id.* at 1233 (quoting S.Rep. No. 91–1084, at 12 (1970), *reprinted in* U.S.C.C.A.N. 5519, 5531). The Federal Reserve Board's Regulation Y lists specified activities that "are so closely related to banking ... as to be a proper incident thereto, and may be engaged in by a bank holding company or its subsidiary ... [,]" and, as mentioned above, includes the activities of "[p]roviding real estate settlement services" and "[p]roviding tax-planning and tax-preparation services to any person." 12 C.F.R. §§ 225.28(b)(2)(viii), (6)(vi). It is important for the Court to examine the context in which these activities were deemed to be "closely related" banking activities in its effort to determine whether the GLBA applies to attorneys engaged in such activities. This contextual analysis comports with Congress' decision to exempt only companies engaged in activities that are "so closely related to banking or managing or controlling banks as to be a proper incident thereto[,]" 12 U.S.C. § 1843(k)(4)(F); *Nat'l Courier Ass'n*, 516 F.2d at 1232, from the general proscription against holding companies owning shares in companies other than banks.

Regulation Y lists a number of activities related to the "making, acquiring, brokering or servicing [of] loans or other extensions of credit" that are considered closely related banking activities. 12 C.F.R. § 225.28(b)(2). In a 1997 amendment of Regulation Y by the Federal Reserve Board that was made to "improve the competitiveness of bank holding companies by eliminating unnecessary regulatory burden[s] and operating restrictions ... [,]" real estate settlement services were included as activities related to the extending of credit. Bank Holding Companies and Change in Bank Control (Regulation Y), 62 Fed.Reg. 9290, 9290, 9305 (Feb. 28, 1997). In a 1990 Order issued pursuant to the BHCA, the FRB recognized that real estate settlement services are "closely related to banking" because bank holding companies and banks have been authorized to provide real estate settlement services, including escrow and distribution services by bank holding companies under land installment sales contracts, the preparation of documentation required to close loans in accordance with federal and state lending requirements, and title insurance activities. *Norwest Corp.*, 76 Fed. Res. Bull. 1058, 1059 (Dec.1990).

Regulation Y also lists a number of activities related to "[a]cting as [an] investment or financial advisor to any person, including ... [p]roviding tax-planning and tax-preparation services to any person." 12 C.F.R. § 225.28(b)(6)(vi). Regulation Y was amended in 1986 to include these tax related services because the FRB

determined that tax planning is closely related to banking because banks provide this service through their trust and financial counseling departments. In addition, banks perform tax analyses of business transactions they finance, provide tax planning services to financial institutions, and provide tax planning services to corporations in connection with merger and acquisition and similar advisory services, and through their leasing subsidiaries.

Bank Holding Companies and Change in Bank Control; Expanded List of Permissible Nonbanking Activities, 51 Fed.Reg. 39,994, 39,997 (Nov. 4, 1986).

As the plaintiffs correctly point out, nowhere in Regulation Y is the practice of law identified as a "non-banking activity" that "is so closely related to banking or managing or controlling banks as to be a proper incident thereto, and may be engaged in by a bank holding company or its subsidiary in accordance with the requirements of th[e] regulation." 12 C.F.R. § 225.28. According to the ABA, this is because "the practice of law could not have been approved for inclusion in Regulation Y because banks and bank holding companies are specifically prohibited from practicing law." ABA Mem. at 18. The ABA points out that

> [i]n its rulemaking, the FRB took explicit note of comments by the public that tax planning advice could stray into the unauthorized practice of law, and the Board specifically instructed that '[w]ith respect to the unauthorized practice of law, the Board notes that the activity must be conducted in strict accordance with the applicable local law, and that *the activity would therefore be prohibited in those jurisdictions that specify the activity as the practice of law.*'

*Id.* (quoting 51 Fed.Reg. at 39,998) (emphasis added by the ABA). The ABA posits that this statement by the Federal Reserve Board is "powerful evidence that none of the financial services described in Regulation Y were intended to include the practice of law." *Id.* at 19. The Court also considers the statement significant because it demonstrates that the Federal Reserve Board expressly recognizes a distinction between the permissible non-banking financial activities listed in Regulation Y and the practice of law.

The activities described in Regulation Y are simply the Federal Reserve Board's list of permissible non-banking activities in which the banking world may engage in because such activities are deemed to be integrally related to the business of banking. Thus, Regulation Y officially permits bank holding companies to engage in, and acquire and retain shares in companies that engage in, real-estate settlement, tax-planning and tax-preparation services because although they are non-banking activities, they "are so closely related to banking." Congress apparently decided to incorporate Regulation Y into the definition of what constitutes a "financial institution" under the GLBA because of its desire to "provide some of the strongest privacy protections to ever be enacted into any federal law[.]" 145 Cong. Rec. H. 11,539–40 (daily ed. Nov. 4, 1999) (statement by Rep. Bruce Vento). Through this incorporation, the GLBA not only protects the private information of consumers directly obtained by financial institutions that are engaged in pure banking activities, but also such information held by financial institutions engaged in those non-banking activities listed in Regulation Y that are "closely related" to banking. This expanded reach of the GLBA fulfills Congress' purpose for enacting the statute.

In *Trans Union*, the appellant, a credit reporting agency, sought to be excluded from the the GLBA's definition of a "financial institution." 295 F.3d at 48. The District of Columbia Circuit found that the FTC's determination that the term "financial institution" applies to credit reporting agencies was reasonable because Regulation Y

> identifies as among activities ... so closely related to banking or managing or controlling banks as to be a proper incident thereto those activities that are usual in connection with making, acquir-

ing, brokering or servicing loans or other extensions of credit, including:

Credit bureau services. Maintaining information related to the credit history of consumers and providing the information to a credit grantor who is considering a borrower's application for credit or who has extended credit to the borrower.

*Id.* at 48 (quoting 12 C.F.R. § 225.28(b)(2)(v)) (internal quotations omitted). Accordingly, the *Trans Union* Court concluded that "[b]ecause the Federal Reserve Board's regulation characterizes credit bureau services as so closely related to banking or managing or controlling banks as to be a proper incident thereto ... the FTC permissibly determined that Trans Union, which provides such services, comes within the GLBA's definition of a 'financial institution'...." *Id.* at 48–49 (internal quotations and citation omitted). The *Trans Union* case is clearly distinguishable from the instant cases and serves as an example of the types of activity Congress sought to regulate by enacting the GLBA. Credit reporting agencies are, by their very nature, institutions that engage in what Regulation Y describes as credit bureau services. The text of Regulation Y supports its applicability to credit reporting agencies, as do the privacy protection objectives that underlie the GLBA. As this Court noted above, Congress was concerned that "[a]s a result of the explosion of information available ... as well as the expansion of financial institutions through affiliations and other means as they seek to provide more and better products to consumers, the privacy of data about personal financial information has become an increasingly significant concern of consumers." *Individual Reference,* 145 F.Supp.2d at 18 (quoting H.R. Rep. 106–74, pt. 3, at 106–07 (1999)). Clearly, Congress was concerned about the personal financial information

that credit reporting agencies possess regarding consumers and the potential unauthorized dissemination of their information to non-affiliated financial institutions. This concern, however, cannot be said to exist for the clients of attorneys, which becomes evident upon examining both the purpose and statutory scheme underlying the GLBA, its legislative history, and the state bar schemes that regulate the practice of law and the confidentiality of clients' information in every jurisdiction in the nation.

(2) ***The Purpose Underlying the GLBA and the Statutory Scheme Utilized to Accomplish Its Objectives***

As this Court indicated above, Congress enacted the GLBA in order to "enhance competition in the financial services industry by providing a prudential framework for the affiliation of banks, securities firms, insurance companies and other financial service providers...." H.R. Conf. Rep. No. 106–434 at 245 (1999), *reprinted in* 1999 U.S.C.C.A.N. at 245, 245. Congress realized that the means of achieving this enhancement within the financial industry would cause a greater concern about the dissemination of consumers' personal financial information:

For example, banks, insurance companies, and securities firms have the capacity to know more about an individual's spending habits than ever before, and could use this information for many purposes, including unwanted marketing and solicitation. To balance these interests, the Act provides consumers with the power to choose how their personal information will be shared by financial institutions.

*Individual Reference,* 145 F.Supp.2d at 18 (citing H.R. Rep. 106–74, pt.3, at 106–07 (1999)). Therefore, Congress included Ti-

tle V ("Disclosure of Nonpublic Personal Information") in the GLBA, to ensure that "each financial institution [would have] an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

15 U.S.C. § 6802 embodies the obligations financial institutions have with respect to the disclosure of personal information and prohibits financial institutions from disclosing nonpublic personal information unless the institution has provided the consumer with a notice that complies with 15 U.S.C. § 6803 (requiring disclosure to the consumer at the time a customer relationship is established and every year thereafter). Additionally, section 6802 contains an "opt out" provision which provides that a "financial institution" may not disclose nonpublic personal information to a non-affiliated third party unless: (1) the institution has advised the consumer that the information may be disclosed; (2) the consumer is given the opportunity to preclude the disclosure of the information; and (3) the consumer is told how the non-disclosure option can be exercised. Section 6802 also includes eight enumerated statutory exceptions. And section 6803 requires that financial institutions, at the inception of a customer relationship and not less than annually thereafter, provide all consumers with a privacy notice which informs current and former customers of the institutions' policies and practices with respect to their disclosure of nonpublic personal information to affiliates and non-affiliated third parties, and how they protect the privacy of such information. In addition, section 6803 lists a number of items that must be included in these disclosures, *i.e.*, the policies and practices of the institution with respect to disclosing nonpublic personal information, the categories of nonpublic personal information collected by the institution, and the polices that the institution maintains to protect the confidentiality and security of the consumers' personal information.

It is apparent to the Court that the purpose underlying the GLBA is further proof that it does not appear that Congress intended for the privacy provisions of the GLBA to apply to attorneys. With the stated purpose of the GLBA's statutory scheme being to provide a "prudential framework" for affiliation within the financial services industry due to all the concerns of Congress about the dissemination of personal information without authorization, certainly Congress did not intend for the GLBA to apply to attorneys. This is because attorneys, by the very nature of pre-existing state ethical rules that govern attorneys, would be prohibited from affiliating with financial institutions and,[10] as a result of the affiliation, disclosing their

---

10. Although the Court does not need to decide whether state bar rules even permit attorneys engaged in the practice of law to affiliate with banks, bank holding companies, other entities engaged in activities that are "so closely related to banking or managing or controlling banks as to be a proper incident thereto … [,]" 12 U.S.C. § 1843(k)(4)(F), or any other entity encompassed by 12 U.S.C. § 1843(k)(4), it seems questionable whether state ethical rules would permit such affiliation. *See, e.g.*, Model Rules of Professional Conduct Rule 5.4 (stating, among other prohibitions, that: (1) except in limited circumstances, "[a] lawyer or law firm shall not share legal fees with a nonlawyer[;]" (2) "[a] lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law[;]" and (3) "[a] lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if … a nonlawyer owns any interest therein … a nonlawyer is a corporate director or officer thereof … or … a nonlawyer has the right to direct or control the professional judgment of a lawyer.").

clients' information without their clients' consent.

### (3) *The Legislative History of the Privacy Provisions of the GLBA*

The purpose underlying the privacy provisions of the GLBA—to regulate the financial industry's dissemination of consumers' personal information—is apparent from the statements members of Congress made when the legislation was being debated. And, in response to a question from the Court during oral argument, counsel for the FTC acknowledged that there is nothing in the legislative history of the GLBA which suggests that Congress was concerned about the dissemination of a client's personal information by attorneys. *See* Transcript of June 2, 2003 Motion Hearing at 7. In fact, the only reference to attorneys in the legislative history of the Act recognized the preexisting state bar regulatory schemes that protect communications between a client and an attorney. Senator Richard Bryan stated that:

> I think most of us have this vague concept that when we are dealing with our bank, when we are dealing with our insurance company, when we are dealing with our stockbroker, that stuff is confidential. Isn't it. Isn't that similar to talking with your lawyer about a legal problem or your doctor about a medical problem or even sharing with your local pastor, your rabbi, your minister, your religious advisor?

145 Cong. Rec. S13891 (daily ed. Nov. 4, 1999). Senator Conrad Burns echoed this misconception the public has about the confidentiality of information provided to the financial world:

> Paramount to our freedom is the right to privacy; to be left alone and to be secure in the belief that our business is just that, ours and no one else's. When we do share our personal business information with others, it is with the real and reasonable expectation that it remains our property. When dealing with our doctor or lawyer we know that the communication is privileged. Traditionally, when providing information to our banker or insurance agent or our stockbroker, we similarly believed that the information provided was specific to that transaction.

145 Cong. Rec. S13908 (daily ed. Nov. 4, 1999). Thus, while the legislative history of the GLBA does not provide a definitive answer to the question before the Court, it does demonstrate that Congress was not concerned about the dissemination by attorneys of nonpublic information communicated to them by their clients. Rather, the legislative history reflects that Congress, in enacting the GLBA, was legislating to provide consumers who provide personal information to the financial community with privacy protections similar to those that already existed in the legal profession.

### (4) *Would Congress Intend to Regulate in an Area that has been Entirely Left to State Regulation Through the Use of Subtle Language?*

In the Court's quest to determine whether Congress intended for attorneys to be subject to the GLBA's definition of what constitutes a "financial institution," the Court has employed all of the traditional tools of statutory construction. This being said, the most convincing evidence that supports the plaintiffs' position that Congress did not intend for the GLBA to cover attorneys is the absence of any explicit statement by Congress that it intended to legislate in an area that was already regulated by existing state regulatory schemes. The ABA advances the position that because the GLBA does not explicitly indicate that attorneys would be subject to the GLBA's privacy provisions, and be-

cause its applicability to attorneys is such a significant matter, "Congress unambiguously intended that the [FTC] *not* act to alter the existing regulatory landscape." ABA Mem. at 11 (emphasis in the original). In determining whether Congress intended for the GLBA to apply to lawyers engaged in the practice of law, the Court has looked to a line of recent Supreme Court cases that address the validity of an agency's attempt to regulate a significant matter based upon mere subtle statutory authority.

In *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994), the Supreme Court was presented with the Federal Communications Commission's ("FCC") interpretation of 47 U.S.C. § 203. This statute "requires communications common carriers to file tariffs with the [FCC]" and "authorizes the [FCC] to 'modify' any requirement. . . ." *Id.* at 220, 114 S.Ct. 2223 (citing 47 U.S.C. § 203(a)-(b)). The FCC employed this modification authority to make tariff filing optional for all nondominant long-distance carriers. *Id.* After examining the plain language of the statute and the meaning of the term "modify," the Court concluded that the FCC's ability to "modify" a requirement of the statute did not permit the agency to make such a significant change to the statute's regulatory scheme. Noting that "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear," Justice Scalia, writing for the majority, stated that "[i]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements." *Id.* at 231, 114 S.Ct. 2223.

Several years later, the Supreme Court was once again faced with an agency's attempt to regulate in a significant area without explicit congressional authorization to do so. In 1996, after it had previously disavowed regulatory authority over tobacco products since its creation, the Food and Drug Administration ("FDA") asserted jurisdiction to regulate tobacco products upon concluding "that nicotine is a 'drug' under the Food, Drug, and Cosmetic Act [ ("FDCA"),] 21 U.S.C. § 301 *et seq.*, and that cigarettes and smokeless tobacco are 'combination products' that deliver nicotine to the body." *Brown & Williamson,* 529 U.S. at 125, 120 S.Ct. 1291 (citing 61 Fed.Reg. 44,397 (1996)). After the FDA promulgated regulations designed to reduce tobacco consumption among children and adolescents, a group of tobacco manufacturers, retailers, and advertisers filed suit challenging these regulations. *Id.* at 125, 129, 120 S.Ct. 1291. In *Brown & Williamson,* the Court began its analysis by recognizing that "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a[ ] harmonious whole[.]" *Id.* at 133, 120 S.Ct. 1291 (internal citations and quotations omitted). The Supreme Court stated that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Id.* (citations omitted). And, a court "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Id.* (citing *MCI Telecommunications,* 512 U.S. at 231, 114

S.Ct. 2223). The *Brown & Williamson* Court examined the FDCA's overall regulatory scheme and concluded that Congress sought to exclude tobacco products from the FDA's jurisdiction. *Id.* at 133–43, 120 S.Ct. 1291. The Court noted that since the enactment of the FDCA in 1965, Congress had "directly addressed the problem of tobacco and health through legislation on six occasions ... [and] the collective premise of these statutes is that cigarettes and smokeless tobacco will continue to be sold in the United States. A ban of tobacco products by the FDA would therefore plainly contradict congressional policy." *Id.* at 137–139, 120 S.Ct. 1291. The Court then examined the six congressional statutes that have addressed tobacco use since the enactment of the FDCA and concluded that "Congress has created a distinct regulatory scheme to address the problem of tobacco and health, and that scheme, as presently constructed, precludes any role for the FDA." *Id.* at 144, 120 S.Ct. 1291. Thus, because of the FDCA's overall regulatory scheme and the subsequent legislation, the Court found that Congress had directly spoken on this issue and precluded the FDA from regulating tobacco products. *Id.* at 160–61, 120 S.Ct. 1291. Particularly significant to this Court's analysis is the *Brown & Williamson* Court's observation that "[d]eference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps. In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 159, 120 S.Ct. 1291 (citing Stephen G. Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L.Rev. 363, 370 (1986) ("A court may also ask whether the legal question is an important one. Congress is

more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.")). Finding that Congress' intent could be gleaned from the FDCA's overall regulatory scheme and tobacco related legislation enacted by Congress, the Court affirmed the Fourth Circuit's conclusion that Congress had not granted the FDA jurisdiction to regulate tobacco products.

In *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("*ATA*"), the Supreme Court considered whether the Administrator of the Environmental Protection Agency ("EPA") could consider the costs of implementing national ambient air quality standards ("NAAQS") under section 109(b)(1) of the Clear Air Act ("CAA"). The Court began its analysis by looking at the plain language of section 109(b)(1), which "instructs the EPA to set primary ambient air quality standards 'the attainment and maintenance of which ... are requisite to protect the public health' with 'an adequate margin of safety.'" *Id.* at 465, 121 S.Ct. 903 (quoting 42 U.S.C. § 7409(b)(1)). The Court noted that the CAA requires the EPA "to identify the maximum airborne concentration of a pollutant that the public health can tolerate, decrease the concentration to provide an 'adequate' margin of safety, and set the standard at that level. Nowhere are the costs of achieving such a standard made part of that initial calculation." *Id.* The Court then observed that numerous other sections of the CAA contained express grants of authorization that permit the EPA to consider costs, *id.* at 467, 121 S.Ct. 903, and that "to prevail in their present challenge, respondents must show a textual commitment of authority to the EPA to consider costs in setting NAAQS under

§ 109(b)(1)[,]" *id.* at 468, 121 S.Ct. 903. Thus, the *ATA* Court concluded that

[j]ust as we found it 'highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even, substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements,' *MCI Telecommunications*, 512 U.S. at 231, 114 S.Ct. 2223, so also we find it implausible that Congress would give to the EPA through these modest words the power to determine whether implementation costs should moderate national air quality standards.

531 U.S. at 468–69, 121 S.Ct. 903 (citing *Christensen v. Harris County*, 529 U.S. 576, 590 n. *, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)) (Scalia, J., concurring in part and concurring in judgment) ("The implausibility of Congress's leaving a highly significant issue unaddressed (and thus 'delegating' its resolution to the administering agency) is assuredly one of the factors to be considered in determining whether there is ambiguity" (emphasis deleted)).

The *MCI Telecommunications, Brown & Williamson*, and *ATA* cases provide significant guidance in the assessment of whether Congress' intent was clear with respect to whether attorneys are considered "financial institutions" under the GLBA and therefore subject to its privacy provisions. Each of these cases stands for the proposition that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say,

hide elephants in mouseholes." *ATA*, 531 U.S. at 468, 121 S.Ct. 903 (citing *MCI Telecommunications*, 512 U.S. at 231, 114 S.Ct. 2223; *Brown & Williamson*, 529 U.S. at 159–60, 120 S.Ct. 1291). And in this case, the FTC's interpretation would have that very effect. Relying on Regulation Y, which itself is merely a list of non-banking activities that a bank holding company or its subsidiaries may engage in, the FTC takes the simplistic viewpoint that if an attorney takes part in Regulation Y's non-banking activities by providing real estate settlement, tax-planning or tax-preparation services, even if these services are offered solely in connection with the practice of law, then the attorney qualifies as a "financial institution" under the GLBA and is subject to its privacy provisions. Implicit in the FTC's interpretation of the GLBA is its assumption that Congress somehow delegated to the FTC the authority to regulate the ethical conduct of attorneys practicing in certain areas of the law with respect to how these attorneys keep their clients' information confidential and their dissemination of such information. The FTC comes to this conclusion even though there is no reference to attorneys in the GLBA, but solely because an ancillary regulation that enumerates certain non-banking activities that a bank holding company may engage in lists several activities that are also performed by attorneys engaged in the practice of law.

This Court cannot agree that Congress would give the FTC jurisdiction to regulate the ethical conduct of attorneys through such a subtle grant of authority.[11] As discussed above, in *Brown & William-*

---

11. Certainly the FTC's interpretation of the applicability of the GLBA to attorneys directly affects an area already regulated by the states and the District of Columbia. This is because, as more fully set forth below, the FTC's interpretation regulates the manner in which attorneys maintain and disclose clients' confi-

dential information. And failure to comply with the GLBA may result in a cease-and-desist order issued by the FTC, which could lead to, among other things, civil penalties of up to $10,000 per violation. *See* NYSBA Compl. ¶ 32 (citing 15 U.S.C. § 45).

*son* the Supreme Court held that in determining congressional intent, a court "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." 529 U.S. at 133, 120 S.Ct. 1291 (citation omitted). The Court finds that it is unlikely that Congress intended for the GLBA to apply to attorneys because there is no clear indication of such a desire. This conclusion is buttressed by the fact that Congress has never sought to regulate the ethical conduct of attorneys. As discussed below, the regulation of lawyers and the practice of law have historically been recognized as the responsibility of the states, and not the federal government.[12]

#### (a) *State Regulation of Attorneys*

In *Leis v. Flynt,* 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979), the Supreme Court stated that

[s]ince the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions. *The States prescribe* the qualifications for admission to practice and *the standards of professional conduct. They also are responsible for the discipline of lawyers.*

*Id.* at 442, 99 S.Ct. 698 (emphasis added). In *Norfolk and Western Ry. Co. v. Beatty,* 400 F.Supp. 234 (S.D.Ill.), *aff'd,* 423 U.S. 1009, 96 S.Ct. 439, 46 L.Ed.2d 381 (1975), which was cited with approval by the *Leis* Court, 439 U.S. at 443, 99 S.Ct. 698, the district court was faced with a challenge to an Illinois state supreme court rule that limited out-of-state lawyers' entitlement to practice law in Illinois, including the providing of legal services in matters that were solely of federal origin. After determining that the rule was not unreasonable, the district court concluded that its intervention into the regulation of attorneys who practice in state courts "would ... [have the impact of] creat[ing] a limited federal or national bar and to impose it on the states. To do so would be in total disregard of the state's great interests in the control and supervision of the practice

---

12. The Court notes that the NYSBA's complaint appears to challenge "[w]hether Congress has exceeded its authority under the Tenth Amendment to the Constitution by purporting to impose the GLBA's privacy requirements on attorneys...." *See* NYSBA Compl. ¶ 15(a). However, in its Surreply, the NYSBA retreats from this position and states that

the FTC mischaracterizes the NYSBA's constitutional argument as asking this Court to confront and decide whether Congress does or does not have the authority under the Tenth Amendment to regulate the practice of law or the confidential attorney-client relationship. This is not what the NYSBA Memorandum says. The issue presented by the NYSBA is not whether Congress **can** regulate the legal profession in certain circumstances; only whether it **did** so here, *i.e.,* whether Congress, *sub silentio,* intended to include lawyers within the definition of 'financial institutions' under the GLBA by not excluding them, despite the Supreme Court's admonition that mere silence is never enough to infer Congressional intent to regulate in an area historically reserved to state regulation.

Plaintiff's Surreply Memorandum at 1 (emphasis in the original). Instead, the NYSBA asserts that

*Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), makes it clear that a court should not attempt to resolve a Commerce Clause/Tenth Amendment confrontation unless it first finds that there is an explicit, articulated congressional intent to regulate an area of state sovereignty set forth on the face of the statute— exactly what is missing here.

*Id.* at 2. For the purposes of this Opinion, the Court finds that the NYSBA's position complements the rule of statutory construction advanced by the ABA and discussed by this Court above. *See* ABA Mem. at 12 n. 6.

of law in its own courts through reasonable requirements for licensing and admission." *Beatty,* 400 F.Supp. at 237.

### (i) *Confidentiality Concerns and Attorneys*

Currently, there are more than 900,000 attorneys licensed to practice law in the United States and every state and many localities have their own legislative or judicial mechanisms that regulate the practice of law. State and Local Bar Amici I at 3; Brief of the Ohio State Bar Association, the Florida Bar Association, the Oklahoma Bar Association, the State Bar of Wisconsin, the Colorado Bar Association, the Cleveland Bar Association, the New Jersey Bar Association, the State Bar Association of North Dakota as Amicus Curiae in Support of Plaintiff's Memorandum in Opposition of the FTC's Motion to Dismiss the Complaint ("State and Local Bar Amici II") at 4–7 & nn. 4–10. The Model Code of Professional Responsibility ("Model Code") and the Model Rules of Professional Conduct ("Model Rules"), which most states have adopted, are the primary mechanisms that regulate the conduct of attorneys. *Id.* at 4–5. What is of particular significance to this case, is that both the Model Code and the Model Rules contain provisions ensuring the protection of clients' information. The ABA notes that those

> States, such as California, whose rules are not based on ABA Model Rule 1.6 or the Rules under Canon 5 of the Model Code of Professional Responsibility,

nonetheless have strictures in place that prohibit attorneys from revealing 'confidences' or 'secrets,' generally subject to the same limited categories of exceptions provided for in ABA Model Rule 1.6(a).

ABA Compl. ¶ 25 (citing Cal. Bus. & Prof. Code § 6068(e) (West 1990) ("It is the duty of an attorney to … maintain inviolate the confidences, and at every peril to himself or herself to preserve the secrets, of his or her client.")). Model Rule 1.6(a) provides that "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure permitted by paragraph (b)." [13] Model Rules of Professional Conduct Rule 1.6(a). Model Code DR 4–101(a) protects against the disclosure of client "confidences," which is defined as information protected by the attorney-client privilege, and the disclosure of client "secrets," which is defined as "other information gained in the professional relationship that the client has requested to be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Brief of Conference of Chief Justices as Amicus Curiae in Support of Plaintiff's Memorandum in Opposition to the FTC's Motion to Dismiss the Complaint ("Conference of Chief Justices Amicus") at 2 n. 1; *see* Model Code of Professional Responsibility DR 4–101(a).[14] The GLBA's privacy pro-

---

**13.** Model Rule 1.6 contains limited exceptions to this general rule:

> (1) to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm; or
> (2) "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim

against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of a client."

**14.** This amicus curiae brief was submitted by the Conference of Chief Justices, an organization comprised of the highest judicial officers of the fifty states, the District of Columbia, the

visions must be examined against these state and local regulatory schemes, which already provide protection against disclosure of clients' personal information to third parties by attorneys.

15 U.S.C. § 6807 provides that the GLBA's privacy provisions "shall not be construed as superseding, altering, or affecting any statute, regulation, order, or interpretation in effect in any State, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency." 15 U.S.C. § 6807(a). Section 6807 also states that "a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter. . . ." The ABA aptly points out that "the nature of the attorney-client relationship distinguishes the practice of law from commercial relationships such as the financial institution-customer relationship. As has been repeatedly stated in judicial decisions going back two hundred years and more, a lawyer owes a client the highest fiduciary duty of loyalty." ABA Mem. at 19 (citing *Stockton v. Ford,* 52 U.S. 232, 247, 11 How. 232, 13 L.Ed. 676 (1850) ("There are few of the business relations of life involving a higher trust and confidence than that of the attorney and client. . . .")). Thus, with this

Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, and the territories of American Samoa, Guam, and the Virgin Islands.

15. The NYSBA points out that attorneys practicing law in the State of New York already are required to notify their clients of their right to privacy during the course of their relationship with their attorneys. Pursuant to 22 N.Y.C.R.R. Part 1210, attorneys in New York are required to display in their office a

case in its current posture, the Court must accept the plaintiffs' assertions, *see Conley,* 355 U.S. at 45–46, 78 S.Ct. 99 (holding that courts must construe the allegations and facts in the complaint in the light most favorable to the plaintiffs and must grant the plaintiffs the benefit of all inferences that can be derived from the alleged facts when construing a Rule 12(b)(6) motion); *Kowal,* 16 F.3d at 1276 (same), that "there are no circumstances in which the GLBA affords greater protection than the rules to which lawyers are already subject[,]" ABA Mem. at 25 n. 11; *see* ABA Compl. ¶ 25 ("As a consequence of the existence and enforcement of statutes and rules in every state protecting the privacy and confidentiality of information disclosed by clients to their attorneys, the application of the GLBA to attorneys engaged in the practice of law would add nothing to the accomplishments of the goals of the GLBA. . . ."); NYSBA Compl. ¶ 67 ("New York rules and regulations governing the conduct of lawyers provide for a greater protection of clients' personal information [then the GLBA]. . . ."). If it is true that the Model Rules, the Model Code, and other similar regulatory schemes already provide greater protection with respect to the dissemination of clients' financial information, then it appears that the only additional requirement the GLBA's privacy provisions would impose on attorneys is the notice requirement,[15] which itself only describes the

"Statement of Client's Rights and Responsibilities." NYSBA Compl. ¶ 65. This statement informs clients: "[y]ou have the right to privacy in your dealings with your lawyer and to have your secrets and confidences preserved to the extent permitted by law." *Id.* While the FTC asserts that New York's notice requirement is not equivalent to the notice requirement of the GLBA, *see* Def.'s Mem. in NYSBA Case at 17 n. 10, the differences between the two requirements are minimal. Comparing the two notice provisions, it ap-

manner in which parties subject to the requirement maintain the confidentiality of consumers' personal information.[16] In any event, the focus of the Court's inquiry here is not on whether Congress can legislate in a manner that impacts on state bar regulatory schemes, but whether Congress intended to do so when it enacted the GLBA.

### (b) *Congressional Intent*

The Court recognizes that the issue before it—whether Congress intended for the FTC to regulate the ethical conduct of attorneys who practice law in the areas of real estate settlement, tax-planning and tax-preparation services—is somewhat unique because the cases that have concluded that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions[,]" *ATA*, 531 U.S. at 468, 121 S.Ct. 903 (citing *MCI Telecommunications*, 512 U.S. at 231, 114 S.Ct. 2223; *Brown & Williamson*, 529 U.S. at 159–160, 120 S.Ct. 1291), have all dealt with existing federal regulatory schemes. Here, however, pre-existing state regulatory schemes are at issue. Guidance in deciding whether Congress

intended for the GLBA's privacy provisions to alter these state schemes is found in the Citizens Protection Act (the "CPA" or the "McDade Amendment"), 28 U.S.C. § 530B, and federal statutes that impact activities performed by attorneys.

### (i) *The Citizens Protection Act*

A good starting point in assessing how Congress has legislated in the past when faced with a federal agency's attempt to regulate the ethical conduct of attorneys in the face of existing state regulatory schemes is the CPA. A brief review of the history that preceded the enactment of the CPA is a necessary predicate to addressing the significance of this legislation. Model Rule 4.2, and its counterpart, DR 7–104(A)(1) of the Model Code,[17] state that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The "no-contact rule" embodied in these rules is an integral part of the rules of professional conduct governing attorneys today, and every state

pears that the GLBA's notice requirements include listing "the categories of information collected and disclosed by the financial institution, as well as its policies and practices with respect to protecting the confidentiality and security of the client's personal information." *Id.* (citing 16 C.F.R. § 313.6(a)). In addition, the FTC notes that the GLBA requires the notice to be sent to the consumer, while New York's rules apparently just require a display in the attorney's office. *Id.* Nevertheless, on the record currently before the Court, it cannot fathom how there is a *material* difference between what the two notices require.

**16.** The "opt out" provision contained in 15 U.S.C. § 6802(b) prohibits a "financial institution" from disclosing nonpublic personal information to non-affiliated third parties unless: (1) a privacy notice is sent to the con-

sumer informing him or her that disclosure is possible; (2) the consumer is given an opportunity to request that such information not be disclosed; and (3) the consumer is given an explanation about how to exercise the non-disclosure option. This "opt out" provision would seem to be inapplicable to attorneys because they are generally prohibited from disclosing confidential information in the first place. *See* Model Rules of Professional Conduct Rule 1.6(a); Model Code of Professional Responsibility DR 4–101(a).

**17.** Disciplinary Rule 7–104(A)(1) is substantially identical to Model Rule 4.2 except for the substitution of the term "person" for "party" in the Model Rules. *Compare* Model Code of Professional Responsibility DR 7–104(A)(1), *with* Model Rules of Professional Conduct Rule 4.2.

and federal district court has adopted a version of it.[18] In *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990), the Second Circuit rejected the argument advanced by the Department of Justice ("DOJ") that state bar conduct rules did not apply to criminal matters or investigations conducted by the United States government prior to the commencement of formal adversarial proceedings. *Id.* at 837. On June 8, 1999, former Attorney General Richard Thornburgh responded to the *Hammad* decision by issuing a memorandum to all Justice Department litigators asserting "that contact with a represented individual in the course of authorized law enforcement activity does not violate" the no-contact rule if the contact occurs before the constitutional right to counsel attaches. Bruce A. Green, *Whose Rules of Professional Conduct Should Govern Lawyers in Federal Court and How Should the Rules be Created?,* 64 Geo. Wash. L.Rev. 460, 471 (1996) (quoting Memorandum from Dick Thornburgh, Attorney General, United States Department of Justice, to All Justice Department Litigators (June 8, 1989)) (copy on file with the author). Relying on the Constitution's Supremacy Clause, the memorandum went on to state that "although the states have the authority to regulate the ethical conduct of attorneys admitted to practice before their courts, ... that authority permits regulation of federal attorneys only if the regulation does not conflict with the federal law or with the attorneys' federal responsibilities." *Id.* In what became known as the "Thornburgh Memorandum," the Justice Department took the position that state bar rules constituted state laws that could not be applied to federal prosecutors if doing so conflicted with the DOJ's legitimate law enforcement objectives. *Id.*

However, the Thornburgh Memorandum was not viewed favorably by the courts. *See, e.g., United States v. Lopez,* 765 F.Supp. 1433, 1453 (N.D.Cal.1991), *vacated on other grounds,* 989 F.2d 1032 (9th Cir.), *amended,* 4 F.3d 1455 (9th Cir.1993) (stating that the government's assertion that federal prosecutors were exempt from state and local rules was "to put it bluntly, preposterous."). The United States House of Representatives' Subcommittee on Government Information, Justice, and Agriculture also noted its disagreement with the DOJ's position, stating "we are not persuaded of a need to exempt Departmental attorneys from Model Rule 4.2 as adopted by State bars and Federal Courts." Subcomm. on Government Information, Justice, and Agriculture Comm. on Government Operations, Federal Prosecutorial Authority in a Changing Legal Environment: More Attention Required, H.R.Rep. No. 986, 101st Cong., 2d Sess. (1990). Then, in August 1994, the DOJ promulgated a regulation entitled "Communications with Represented Persons." 28 C.F.R § 77 (otherwise known as the "Reno Regulation"). The Reno Regulation was intended to supersede state ethics rules and ensure that federal prosecutors would not be subject to more restrictive rules by the states. *Id.* However, courts found this regulation equally unavailing. *See, e.g., United States v. McDonnell Douglas Corp.,* 132 F.3d 1252 (8th Cir.1998) (agreeing with defendant's employees' position that state no-contact rules precluded investigative agents of the DOJ from communi-

---

**18.** Bruce A. Green, *Whose Rules of Professional Conduct Should Govern Lawyers in Federal Court and How Should the Rules be Created?,* 64 Geo. Wash. L.Rev. 460, 471 (1996) (citing Stephen Gillers & Roy D. Simon, Jr., *Regulation of Lawyers: Statutes and Standards,* 270–72 (1996)).

cating with represented individuals and rejecting government's assertion that the Reno Regulation superceded local court rules).

On October 21, 1998, in the face of the Justice Department's repeated attempts to exclude its attorneys from compliance with state bar rules, Congress adopted the Omnibus Consolidated and Emergency Supplemental Appropriations Bill, which included the CPA as a rider to the DOJ's appropriations for fiscal year 1999. *See* 28 U.S.C. § 530B. In what has become known as the McDade Amendment, the CPA states that "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."[19] This legislation, which was enacted in direct response to the DOJ's attempt to exempt its lawyers from state ethical rules, is telling because it reflects the respect Congress has for the right of the states to regulate the ethical conduct of lawyers who practice law in their jurisdictions. The events that preceded the enactment of the CPA are also noteworthy because they represent a rebuff by both the legislative and judicial branches of attempts by the executive branch to regulate in an area that has been left exclusively in the hands of the states.

### (ii) *Federal Statutory Schemes that Regulate the Conduct of Attorneys*

As support for its position that the GLBA covers attorneys, the FTC cites numerous congressional statutes that apply to the activities of attorneys. Its reliance on these statutes is flawed because not only do none of the statutes purport to generally regulate the ethical conduct of attorneys, but the scope of the applicability of these statutes is much broader than that of the GLBA. *See, e.g.,* 15 U.S.C. § 1692a ("Fair Debt Collection Practices Act" or "FDCPA") ("The term 'debt collector' means *any person* who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of debts ....") (emphasis added);[20] 15 U.S.C. § 1681n ("Fair Credit Reporting Act") ("*Any person* who willfully fails to comply with any requirement imposed under this subchapter ....") (emphasis added); 15 U.S.C. § 1 ("Sherman Antitrust Act") ("*Every person* who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal ....") (emphasis added); 42 U.S.C. § 1983 ("Civil Rights Act of 1964") ("*Every person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall

---

**19.** In fact, Congress mandated that "[t]he Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section." 28 U.S.C. § 530B(b).

**20.** In *Heintz v. Jenkins,* 514 U.S. 291, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995), the Supreme Court found that the term "debt collector" as used in the FDCPA applied to the litigation activities of attorneys. The *Heintz* Court's rationale for concluding that Con-

gress intended the FDCPA to apply to attorneys is important because the Supreme Court noted that in an earlier version of the statute, the term "debt collector" had explicitly exempted attorneys, but this exemption was later repealed by Congress. For the *Heintz* Court, this omission evidenced Congress' intent for the FDCPA to apply to attorneys. The GLBA does not have a similar legislative history.

be liable ....") (emphasis added); 42 U.S.C. § 2000e ("Title VII") ("The term 'person' includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers."); 18 U.S.C. § 1962 ("RICO") ("It shall be unlawful for *any person* who has received any income derived, directly or indirectly, from a pattern of racketeering activity ....") (emphasis added); 15 U.S.C. § 78j (federal securities law) ("It shall be unlawful for *any person,* directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails ....") (emphasis added). Clearly, Congress intended the scope of each of these statutes to be extremely broad, describing each of them to be applicable to "any person" or "every person." In fact, in a case on which the FTC relies heavily for the proposition that Congress can regulate the conduct of attorneys, the Supreme Court commented that the scope of the federal statute before it, the Sherman Antitrust Act, is so broad that "language more comprehensive is difficult to conceive." *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 787, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (quoting *United States v. S–E Underwriters Ass'n,* 322 U.S. 533, 553, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944)) (noting that "Congress intended to strike as broadly as it could in § 1 of the Sherman Act"). The GLBA, on the other hand, is limited in its scope to "financial institutions." This is significant because the scope of all but one of the statutes cited by the FTC contains language that is so broad that it is inconceivable that Congress did not intend for the statutes to apply to attorneys. This is clearly not the case with the GLBA.

The only statute cited by the FTC that does not contain such broad language is the Truth in Lending Act ("TLA"), 15 U.S.C. § 1635, which applies only to certain types of creditors. In *Jenkins v. Landmark Mortgage Corporation of Virginia,* 696 F.Supp. 1089 (W.D.Va.1988), the district court granted the plaintiff a declaratory judgment permitting her to rescind a consumer credit transaction with her lender, even though her rescission was after the three-day period prescribed in a "Notice of Right to Cancel." The *Jenkins* Court allowed the rescission, in part, because the attorney "in his role as agent for the lender, ... conveyed information which contradicted both the statutory and regulatory provisions and the disclosure forms which he transmitted to the plaintiff." *Id.* at 1095. Thus, it appears that this case stands for the limited proposition that creditors can be liable for their attorney's conduct as the creditor's agent in a consumer credit transaction. Moreover, the Court in *Jenkins* did not say that the TLA imposed any ethical obligations on attorneys involved in covered activities. Thus, *Jenkins* does not stand for the proposition for which it has been offered.

The FTC also references a separate statute that regulates real estate settlement procedures that includes attorneys within its scope. The Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.,* imposes certain procedural requirements on the real estate settlement industry. Within this statute, Congress specifically provides that

> the term 'settlement services' includes any service in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, *services rendered by an attorney,* the preparation of documents ... and the handling of the processing, and closing or settlement[.]

12 U.S.C. § 2602(3) (emphasis added). This statute is noteworthy for several reasons, but not for the reason offered by the FTC.

First, it demonstrates that Congress knows how to include the profession of law in legislation when it desires a statute to cover attorneys. Courts have found that when Congress legislates in one area with explicit reference in a statute on an area of concern, but fails to reference that same subject matter in another statute, its silence is evidence that Congress did not intend for there to be applicability in the latter statute. *See Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484–85, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (comparing the relief available under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and analogous provisions in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and noting that the failure to reference past cleanup costs in the RCRA demonstrates that Congress did not intend for this to be an available remedy because Congress provided for such relief in the CERCLA); *McFarland v. Scott*, 512 U.S. 849, 861, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994) (O'Connor, J., concurring in the judgment in part and dissenting in part) (concluding that "Congress knows how to give courts the broad authority to stay proceedings ... [as] Congress expressly provided [the Supreme] Court with authority to grant stays pending the filing of a petition for a writ of certiorari ... [and t]he absence of such explicit authority in the habeas statute is evidence that Congress did not intend federal courts to enter stays of execution...."); *Bohac v. Dept. of Agriculture*, 239 F.3d 1334, 1341–42 (Fed.Cir.2001) (noting that "if Congress had intended to allow broad recovery for non-pecuniary damages [under the Whistleblower Protection Act], it seems likely that it would have used the well-understood term 'compensatory damages,'" as it did in the Civil Rights Act of 1991).

Second, in defining the scope of what constitutes "settlement services" under the RESPA, Congress listed numerous activities, including those that are performed primarily by attorneys (*i.e.*, title searches and title examinations, etc.). Knowing that such activities are routinely performed by attorneys, and in some states can only be performed by attorneys,[21] Congress still explicitly included attorneys within the statute's scope. What Congress did when it drafted the RESPA is insightful because Congress could have simply listed the types of activities the RESPA was intended to cover, including those activities primarily performed by attorneys, without explicitly referencing attorneys. This is what it did when it enacted the GLBA. However, Congress did not do that in the RESPA, but rather was careful to explicitly include within the statute's coverage "services rendered by attorneys."[22]

21. Palomar, Joyce, *Title Searches and Examinations versus Title Opinions*, 1 Title Ins. Law § 13:8 (June 2002).

22. In addition, the FTC also points to the Sarbanes–Oxley Act of 2002, 15 U.S.C. § 7245, as a statute that regulates the ethical conduct of attorneys. The Sarbanes–Oxley Act subjects attorneys who practice before the Securities and Exchange Commission to federal "professional conduct" standards. *Id.* This statute is inapposite, however, because it cannot be disputed that a federal agency can regulate the conduct of attorneys who appear before it, just as this Court can regulate the professional conduct of attorneys that appear before it. *See* Local Rules of the United States District Court for the District of Columbia L. Cv. R. 83.8.

This seems to be clear proof that Congress did not intend for the GLBA to extend to attorneys.

Finally, the Court notes that the legislative history of the RESPA indicates that Congress sought to regulate real estate settlement services performed by attorneys based upon a specific concern that such regulation was necessary. For example, the Senate indicated that the RESPA provisions were "intended to prohibit all kickback or referral fee arrangements[,]" because "[i]n a number of areas of the country, competitive forces in the conveyancing industry have led to the payment of referral fees, kickbacks, rebates and unearned commissions as inducements to those persons who are in a position to refer settlement business." S.Rep. No. 93–866, at 5 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551. As an example the Senate stated that "[a]n attorney may give a portion of his fee to another attorney, lender or realtor who simply refers a prospective client to him."[23] S.Rep. No. 93–866, at 6, *reprinted in* 1974 U.S.C.C.A.N. at 6551. Clearly, Congress was concerned about the assessment of excessive real estate settlement fees and the collection of kickbacks or referral fees by attorneys, which is why Congress saw the need to regulate the conduct of attorneys. This articulated concern is notable because, as mentioned above, it is undisputed that there was no concern expressed in the GLBA's legislative history regarding the need to regulate the conduct of how attorneys handle confidential material they receive from clients.

For the aforementioned reasons, this Court finds, utilizing the traditional tools of statutory interpretation, that it is unable to conclude as a matter of law that Congress intended for the GLBA's privacy provisions to apply to attorneys who provide legal services in the fields of real estate settlement, tax-planning and tax-preparation. This conclusion is compelled by the plain language, the underlying purpose, and the legislative history of the GLBA, which all indicate that it does not appear that Congress intended for attorneys to be considered "financial institutions." It is also doubtful that Congress would alter a regulatory scheme that has always been under the authority of the states without even a hint that newly enacted legislation was venturing into that area. In other words, the delegation of authority to the FTC by Congress to regulate the ethical conduct of attorneys in the face of approximately two hundred years of exclusive state regulation in such a subtle way would be, in the words of Justice Scalia, like "hid[ing an] elephant[ ] in a mousehole." *ATA,* 531 U.S. at 468, 121 S.Ct. 903.

### (5) *If the GLBA is Ambiguous or Silent as to Whether Congress Intended for the Act to Apply to the Practice of Law, Is the FTC's Interpretation Valid?*

Even if this Court could find on the existing record that the GLBA is ambiguous or silent on its applicability to attorneys engaged in the practice of law, the FTC's interpretation would still likely be invalid. Once a court concludes that a statute is ambiguous or silent on an issue, the second step of *Chevron* requires the court to determine whether and what kind of deference should be accorded to the agency's interpretation of a statute it is

---

**23.** The Senate also noted that "[t]he second largest element of the $14 billion settlement bill are closing charges. These charges total $4.3 billion a year, with most of the money going to lenders, title insurance companies and *attorneys.*" S.Rep. No. 93–866, at 17, *reprinted in* 1974 U.S.C.C.A.N. at 6565 (emphasis added).

charged with implementing. In *Christensen,* the Supreme Court noted that

> [i]n *Chevron,* we held that a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute. Here, however, we confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference. Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those interpretations have the "power to persuade," *id.*

529 U.S. at 586–87, 120 S.Ct. 1655 (citations omitted). Most recently in *United States v. Mead Corporation,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), the Supreme Court addressed the varying degrees of deference given to an agency's interpretation of a statutory scheme that the agency is entrusted to administer. *Id.* at 227–28, 121 S.Ct. 2164. The *Mead* Court stated that:

> [t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position. The approach has produced a spectrum of judicial responses, from great respect at one end, to near indifference at the other. Justice Jackson summed things up in *Skidmore v. Swift & Co.:*

> The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.* at 228, 121 S.Ct. 2164 (internal citations omitted) (bracketed language in the original).

In determining what degree of deference should be given to the FTC's interpretation that attorneys are subject to the privacy provisions of the GLBA, the Court must turn to the FTC's April 8, 2002, Opinion Letter, which states in its entirety:

> I am writing in response to your correspondence regarding the application of Title V, Subtitle A, of the Gramm–Leach–Bliley Act, 15 U.S.C. §§ 6801 *et seq.* ("GLB Act") and the Federal Trade Commission's Rule, Privacy of Consumer Financial Information, 16 CFR § 313 ("the Privacy Rule"), to attorneys at law.

> Your letters questions the appropriateness and utility of applying the GLB Act's privacy provisions to attorneys engaged in the practice of law. Specifically, you request that the Commission exempt attorneys at law from the application of the Privacy Rule.

> We have carefully considered your concerns, and recognize the issues you raised regarding the application of the GLB Act to attorneys at law. However, there are significant questions as to the legal authority of the Commission to grant the exemption you request.

> As you know, the GLB Act itself states that entities engaged in 'financial activities' are subject to the Act. Although the Commission has express authority under the GLB Act to grant

exceptions, that authority is limited to providing exceptions to the requirements of Section 502 [, 15 U.S.C. § 6802]. The Act does not provide the Commission with express authority to grant exemptions from the other provisions of the GLB Act, including the initial and annual notice provisions. *See* GLB Act § 504(b), 15 U.S.C. [§ ] 6804(b).

ABA Mem., Ex. A; *see* NYSBA Compl. ¶¶ 45–50.[24]

There are ample reasons to deny *Chevron* deference in this case. First, it is undisputed that the FTC's interpretation that attorneys are subject to the GLBA's privacy provisions was not the result of any notice-and-comment rulemaking or a formal adjudication. On March 1, 2000, pursuant to the FTC's authority to promulgate regulations in accordance with the GLBA, *see* 15 U.S.C. § 6804(a), the FTC published a Notice of Proposed Rulemaking in the Federal Register. *See* Privacy of Consumer Financial Information, 65 Fed.Reg. 11,174 (proposed Mar. 1, 2000). Following the submission of comments by the public, the FTC promulgated its final rule on May 24, 2000. *See* 16 C.F.R. § 313.18. Although both of the proposed and final rules discuss in detail those institutions that qualify as "financial institutions" under the GLBA, nowhere is the practice of law or attorneys mentioned. Commenting on a similar situation, the *Mead* Court stated that

> [i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness

and deliberation that should underlie a pronouncement of such force. *Cf. Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) ("APA notice and comment 'designed to assure due deliberation.' "). Thus, the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication.

533 U.S. at 230, 121 S.Ct. 2164 (citations omitted). While the *Mead* Court went on to state that the absence of any formal procedures by an agency does not alone bar *Chevron* deference, *id.* at 230–31, 121 S.Ct. 2164 (citation omitted), the absence of a deliberative processes is significant in this case. The Court so concludes because it appears from the limited record in this case that the FTC's actual decision that attorneys who practice in the areas of real estate settlement, tax-planning and tax-preparation services are "financial institutions" within the meaning of the GLBA, and thus subject to its privacy provisions, was apparently made after the rulemaking process had been completed. The pronouncement of this policy was simply orally disseminated by the staff of the FTC and then circulated by the press. *See* NYSBA Compl. ¶ 37 (citing Center for Regulatory Effectiveness, "FTC Determines Attorneys to be Subject to Notice Requirements of Gramm–Leach–Bliley Act" (reprinting Feb. 23, 2001 letter to FTC from Boston Bar Association)); ABA Compl. ¶ 18 (same). The total lack of a deliberative process by the FTC before

---

24. The Court notes that *Chevron* deference would apply to the FTC's interpretation of the GLBA if it was contained in a regulation. However, in this case, the FTC's regulation, 16 C.F.R. § 313, is silent about the applicability of the GLBA's privacy provisions to attorneys. *See Christensen,* 529 U.S. at 587–88, 120 S.Ct. 1655 (applying *Skidmore* deference to an agency's opinion letter and noting that agency's regulation said nothing about the issue before the Court).

reaching its decision on this issue is problematic.

While the Court concludes that the FTC's interpretation is clearly beyond the "*Chevron* pale," this does not end the Court's inquiry, as the interpretation may be entitled to some degree of deference. *See Mead,* 533 U.S. at 234, 121 S.Ct. 2164 (noting that although the agency's "ruling letters do not fall within *Chevron*" they may be entitled to *Skidmore* deference). The *Mead* Court noted that "*Chevron* did nothing to eliminate *Skidmore's* holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, 323 U.S. at 139, 65 S.Ct. 161, and given the value of uniformity in its administrative and judicial understandings of what a national law requires, *id.* at 140, 65 S.Ct. 161." 533 U.S. at 234, 121 S.Ct. 2164. However, as this Court stated above, an agency's interpretation is entitled to "respect" under *Skidmore* "only to the extent that those interpretations have the 'power to persuade,' " *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161), or as the *Mead* Court put it, "respect proportional to [the agency's interpretation's] 'power to persuade,' " 533 U.S. at 235, 121 S.Ct. 2164 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161). The *Mead* Court stated that the agency's interpretation "may surely claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." *Id.*

Here, the Court concludes that no such weight can be given to the FTC's interpre-

tation. This result is called for because the FTC's interpretation appears to have been made without any degree of deliberation, thoughtful consideration or comments from the public. The April 8, 2002, one-page Opinion Letter makes a passing reference to the GLBA's applicability to attorneys in one sentence, stating "[y]our letters question the appropriateness and utility of applying the GLBA Act's privacy provisions to attorneys engaged in the practice of law." *See* ABA Mem. Ex. A; NYSBA Compl. ¶ 45. The FTC goes no further in this Opinion Letter other than recognizing that the plaintiffs are concerned about the applicability of the GLBA to attorneys. The letter fails to provide any logic for the FTC's interpretation of the GLBA and the vagueness of the Opinion Letter reflects a complete lack of any thoughtful deliberations.

Instead, what is before the Court is the FTC, for the first time, explaining in its motions to dismiss, the rationale behind its decision that attorneys are subject to the privacy provisions of the GLBA. Such *post hoc* rationalizations are inadequate under *Chevron* and cannot serve as a substitute for an agency's reasoned decision-making.[25] In *City of Kansas City, Missouri v. HUD,* 923 F.2d 188 (D.C.Cir.1991), the District of Columbia Circuit was faced with a challenge under section 111 of the Housing and Community Development Act of 1974 ("HDCA"), 42 U.S.C. § 5311. *Id.* at 188–89. The appellant asserted that pursuant to the HDCA, HUD was required to give notice and conduct a hearing under section 111 prior to terminating a grant it had made to the City. *Id.* The *Kansas City*

---

**25.** The Court notes that even prior to *Chevron,* courts recognized that *post hoc* rationalizations were no substitute for agency action. *See, e.g., NLRB v. Metro. Life Ins. Co.,* 380 U.S. 438, 442–44, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965) ("the integrity of the administra-

tive process requires that 'courts may not accept appellate counsel's *post hoc* rationalizations for agency action ....' ") (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (emphasis added)).

case is instructive as this Circuit concluded that

> HUD has offered no interpretation of section 111 entitled to judicial deference under the second prong of *Chevron.* The agency construction for which HUD seeks deference was never promulgated by the Secretary, or his designee, nor by administrative regulations, not by decisions in agency adjudications; rather, agency counsel contends that the 'permissible construction of the statute' for which it seeks approval as the agency's litigation posture in this case. For purposes of *Chevron,* this is patently insufficient. That counsel advances a particular statutory interpretation during the course of trial does not confer upon that interpretation any special legitimacy. Deference under *Chevron,* even in the context of informal adjudication, can be accorded only to a judgment of the agency itself.

*Id.* at 192 (citing *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778 ("[T]he Court refers to 'a reasonable interpretation made by the administrator of an agency.' ")).

This Court is simply unable to conclude that the FTC's interpretation that the scope of the GLBA's privacy provisions encompasses attorneys is something to which the Court "may properly resort for guidance." *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. Therefore, even if this Court could conclude that congressional intent was not clear on the issue of the applicability of the GLBA to attorneys, which the Court already concluded does not appear to be the case, the FTC's interpretation falls beyond the pale of both *Chevron* and *Skidmore* and thus is entitled to no deference.

For all the reasons expressed above, this Court concludes that it is unable to hold as a matter of law that the FTC's interpretation that Congress intended for the GLBA to apply to attorneys is correct.

**(B) *Is the FTC's Interpretation that Attorneys are Subject to the GLBA's Privacy Provisions Arbitrary and Capricious Agency Action?***

■ The Court will now consider the plaintiffs' challenge to the FTC's interpretation of the GLBA under the "arbitrary and capricious" standard of 5 U.S.C. § 706(2)(A). The Court need not spend much time on this question because the review of this challenge overlaps, to a large degree, with the Court's analysis under the second step of *Chevron.* *See American Petroleum,* 216 F.3d at 57–58 (noting that in earlier cases on the same issue that was before the court it had not considered whether the agency's reasoning was arbitrary and capricious under the APA because "[t]he second step of *Chevron* analysis and *State Farm* arbitrary and capricious review overlap, but are not identical.") (citations omitted).

Challenges under § 706(2)(A) focus mainly on the decision-making process and the rationale behind an agency's decision. The scope of review under the arbitrary and capricious standard focuses on whether the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation of its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm,* 463 U.S. at 43, 103 S.Ct. 2856. Here, upon review of the Opinion Letter, which is really all the Court has before it to shed light on the FTC's thinking when it took the action that is being challenged, the Court cannot even speculate as to the

basis for the FTC's decision that the privacy provisions of the GLBA apply to lawyers. Accordingly and for the following reasons, the Court is unable to conclusively state that the FTC engaged in reasoned decision-making under *State Farm* and that its decision was not arbitrary and capricious agency action.

The FTC has failed to articulate *any* explanation, let alone a satisfactory one, for its interpretation. *See State Farm,* 463 U.S. at 43, 103 S.Ct. 2856 ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (citation omitted)). In *Panhandle Eastern Pipe Line Company v. FERC,* 890 F.2d 435 (D.C.Cir.1989), the District of Columbia Circuit stated that under the arbitrary and capricious standard, an agency "must engage in reasoned decisionmaking, taking a hard look at the salient problems before it. . . ." *Id.* at 439 (internal quotations and citations omitted). It seems quite clear that the FTC failed to take that "hard look" before it decided that attorneys are subject to the GLBA. It is obvious from the April 8, 2002, Opinion Letter that the ABA raised with the FTC "the appropriateness and utility of applying the GLB Act's privacy provisions to attorneys engaged in the practice of law." ABA Mem., Ex. A. The main thrust of the plaintiffs' arguments is that Congress could not have intended for the GLBA's privacy provisions to apply to the practice of law because the confidentiality of clients' personal information is already protected by states' bar rules. The NYSBA also asserts that the FTC's interpretation implicates a serious Tenth Amendment question as to whether Congress intended "to regulate in an area historically reserved to state regulation." NYSBA Plaintiff's Surreply Memorandum at 1. The FTC, which according to its Opinion Letter recognized

these concerns, nevertheless failed to state why the concerns were being rejected. Now, the FTC, citing *State Farm,* takes the position that its decision must be upheld "if [an agency's] path may reasonably be discerned." 463 U.S. at 43, 103 S.Ct. 2856 (citation omitted). However, as the ABA aptly points out, "[t]he FTC's path, of course, cannot be discerned where there simply is no explanation. The FTC's belated effort to explain its decision to this Court is, of course, nothing more than 'counsel's *post hoc* rationalizations for agency action' that the Supreme Court deemed unacceptable in *State Farm."* ABA Mem. at 33–34 (quoting *State Farm,* 463 U.S. at 50, 103 S.Ct. 2856).

In *State Farm,* the petitioners challenged the National Highway Traffic Safety Administration's ("NHTSA") decision to rescind the requirement that new automobiles had to be equipped with passive restraints. 463 U.S. at 34, 103 S.Ct. 2856. Although the NHTSA did not address a mandatory airbag option in its decision-making process, the petitioners "recite[d] a number of difficulties that they believe[d] would be posed by a mandatory airbag standard." *Id.* at 49–50, 103 S.Ct. 2856. The Supreme Court stated, however, that "these are not the agency's reasons for rejecting a mandatory airbag standard . . . [and i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50, 103 S.Ct. 2856 (citations omitted). In *Yakima Valley Cablevision, Inc. v. FCC,* 794 F.2d 737 (D.C.Cir.1986), the District of Columbia Circuit was confronted with the FCC's refusal to resolve the petitioner's franchise-fee dispute despite having routinely and consistently resolved such disputes for over ten years. *Id.* at 745. The *Yakima Valley* Court stated that "[t]he only possible explanation for the agency's refusal to resolve the petition-

er's franchise-fee disputes is that the Commission *retroactively* changed its longstanding policy of resolving disputes under its franchise-fee regulation; no other credible explanation has been offered." *Id.* (emphasis in the original). Assessing whether this failure to act was arbitrary and capricious, the Court noted that

> [a]lthough counsel for the Commission conceded at oral argument that there is absolutely no basis in the record for the agency's decision to change its enforcement policy retroactively, the FCC contends that we should affirm the Commission's exercise of its 'sound discretion' not to issue a declaratory ruling. We disagree. In the instant case, the Commission flatly refused to process *all* pending cases under an existing rule pursuant to longstanding procedures developed to resolve franchise-fee disputes. *No intelligible explanation was offered for its decision.* This unexplained retroactive shift in agency policy surely is not insulated from review on a claim of an exercise of 'sound discretion.' In short, the Commission cannot avoid its obligation to justify retroactive rulemaking by relying on counsel's *post hoc* attempt to recast the nature of the agency's action.

*Id.* at 746–47 (second emphasis added and first emphasis in the original). As this Circuit stated in *Kansas City,* " '[a]rbitrary and capricious' review under *State Farm* and *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ..., demands evi-

dence of reasoned decisionmaking *at the agency level;* agency rationales developed for the first time during litigation do not serve as adequate substitutes." 923 F.2d at 192 (citing *Overton Park,* 401 U.S. at 419, 91 S.Ct. 814 (" *'post hoc'* rationalizations ... have traditionally been found to be an inadequate basis for review")) (emphasis in the original). Here, even though the FTC has attempted to rationalize its decision-making process in the papers it has filed in conjunction with its motions to dismiss, this cannot be a substitute for the reasoned decision-making process that an agency must undertake when making the decision itself. Accordingly, the Court concludes that the FTC's interpretation that attorneys are subject to the GLBA's privacy provisions appears to constitute "arbitrary and capricious" agency action under 5 U.S.C. § 706(2)(A).

**(C)** ***Assuming that Attorneys are Subject to the GLBA's Privacy Provisions, Was the FTC's Failure to Consider a De Minimis Exemption for Attorneys from Coverage Under the GLBA Arbitrary and Capricious Action?***

Assuming *arguendo* that the GLBA's definition of a "financial institution" covers attorneys engaged in the practice of law, the Court would still be unable to dismiss the plaintiffs' complaints because it appears that the FTC's failure to consider whether attorneys are entitled to a *de minimis* exemption was arbitrary and capricious agency action.[26] The GLBA provides the FTC with two statutory exemp-

---

**26.** The Court assumes that the ABA will file a copy of its exemption request if it seeks summary judgment on this issue. This would obviously be necessary because the District of Columbia Circuit has held that an agency does not even need to consider a *de minimis* waiver request unless the exemption petition "explicitly" requests such a waiver. *Bell-South Corp. v. FCC,* 162 F.3d 1215, 1224

(D.C.Cir.1999) (noting that because the appellant "did not explicitly present a *de minimis* argument in its waiver petition, the [agency] had no reason to address this argument in its letter ruling.") (emphasis in the original). Thus, the Court will ultimately need to review the request itself to determine whether its denial was arbitrary and capricious.

tion mechanisms. First, in 15 U.S.C. § 6802, the Act lists eight enumerated exceptions to the notice requirement and opt-out provision of section 6802 concerning the disclosure of nonpublic personal information. 15 U.S.C. § 6802(e). Second, Congress has also provided that "[t]he regulations prescribed under [the agency's rulemaking authority] may include such additional exceptions to [the requirements] of section 6802 with respect to regulations prescribed under the FTC's rulemaking authority as are deemed consistent with the purposes of this subchapter."[27] 15 U.S.C. § 6804(b).

In addition to statutory exemptions, agencies typically have a "residual" or "inherent *de minimis*" authority to provide exemptions from a regulatory scheme it administers "when the burdens of regulation yield a gain of trivial or no value." *Envtl. Def. Fund, Inc. v. EPA*, 82 F.3d 451, 466 (D.C.Cir.1996) (quoting *Alabama Power Co. v. Costle*, 636 F.2d 323, 360–61 (D.C.Cir.1979) (emphasis added)). The District of Columbia Circuit has long rec-

ognized that "categorical exemptions from the requirements of a statute may be permissible 'as an exercise of agency power, inherent in most statutory schemes, to overlook circumstances that in context may fairly be considered *de minimis*.' " *Id.* (quoting *Alabama Power*, 636 F.2d at 360 (emphasis added)). The District of Columbia Circuit explained that "[t]his principle derives from the commonplace notion that 'the law does not concern itself with trifling matters.' The ability to create a *de minimis* exemption 'is not an ability to depart from the statute, but rather a tool to be used in implementing the legislative design.' " *Id.* (quoting *Alabama Power*, 636 F.2d at 360) (emphasis added). The *Environmental Defense Fund* Court went on to state that "[a]s long as the Congress has not been 'extraordinarily rigid' in drafting the statute ... 'there is likely a basis for an implication of *de minimis* authority....' " *Id.* (quoting *Alabama Power*, 636 F.2d at 360–61 (emphasis added)). The FTC does not dispute that it has the inherent authority to grant *de minimis* exemptions to the GLBA's privacy provisions, as

---

**27.** The NYSBA has also challenged the FTC's position in the Commission's brief that while the FTC has exemption authority with respect to the requirements of 15 U.S.C. § 6802, section 6804(b) does not "empower the Commission to grant exemptions from other requirements of the GLBA, such as the notice requirements set forth in [section 6803]." Def.'s Mem. in NYSBA Case at 11–12. The FTC contends that

[a]lthough Sections [6802] and [6803] cross-reference each other, they set forth distinct requirements and NYSBA errs in supposing that the Section [6803] disclosure requirements are simply 'part and parcel' of the Section [6802] requirements. Congress drafted the exemption authority of Section [6804(b)] with precision, granting such authority with respect to four listed subsections of Section [6802], but *not* with respect to Section [6803] or other provisions of the Act.

*Id.* at 12 (emphasis in the original). The NYSBA asserts that the FTC has misconstrued the GLBA because sections 6802 and 6803 are "integrally related and interdependent." Memorandum of the NYSBA in Opposition to the FTC's Motion to Dismiss the Complaint ("NYSBA Mem.") at 43. According to the NYSBA, "[section 6802] requires that consumer notices comply with the requirements of [section 6803], which describes the timing and content of privacy 'disclosures.' The 'disclosure' section simply elaborates on what such a notice must contain and when it must be provided." *Id.* Thus, the NYSBA contends that the FTC does have authority to exempt covered parties from any notice or disclosure requirements contained within the GLBA. The Court does not need to address this NYSBA claim because it has already concluded that it appears Congress did not intend for the GLBA to apply to the practice of law and, in any event, the FTC's treatment of the exemption request appears to be arbitrary and capricious agency action.

the Commission has already granted such an exemption to institutions of higher education that comply with the Federal Educational Rights and Privacy Act ("FERPA"). FTC Reply to ABA at 22 ("The Commission has already provided several reasons why subjecting to the GLBA universities that comply with FERPA provides little or no public benefit and therefore falls within the Commission's inherent *de minimis* authority . . . ."); *see* 16 C.F.R. § 313.1(b) (granting exemption to institutions of higher education that comply with FERPA).

In *Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221 (D.C.Cir. 1993), the District of Columbia Circuit stated that

> a refusal to grant any changes in the definition, either by way of modification of the regulation or through an exception, presents a less vulnerable target for challenge under the APA. We have often held that the scope of judicial review of a refusal to engage in rulemaking, *see, e.g., American Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d 1, 4–5 (D.C.Cir.1987); *WWHT, Inc. v. FCC*, 656 F.2d 807, 817–18 (D.C.Cir.1981), or a refusal to grant waivers or exceptions, *see, e.g., City of Angels Broad., Inc. v. FCC*, 745 F.2d 656, 663 (D.C.Cir.1984); *Thomas Radio Co. v. FCC*, 716 F.2d 921, 924 (D.C.Cir.), *cert. denied*, 409 U.S. 1027 (1972), is quite narrow.

*Id.* at 1224–25. Nevertheless, as this Court explained above, an agency "must engage in reasoned decisionmaking, taking a hard look at the salient problems before it. . . ." *Panhandle E. Pipe Line*, 890 F.2d at 439 (internal quotations and citations omitted). This requirement is equally applicable to an agency's decision-making process when considering a request for a waiver from a regulatory scheme. *See Omnipoint Corp. v. FCC*, 213 F.3d 720,

723 (D.C.Cir.2000) (applying arbitrary and capricious standard to agency's decision to deny appellant's request for a waiver); *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C.Cir.1999) (same); *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir.1969) (same). In *BellSouth*, the District of Columbia Circuit commented that

> [t]he 'hard look' requirement assures that a general rule serving the public interest for a broad range of situations will not be rigidly applied where its application would not be in the public interest . . . Therefore, *when an agency receives a request for waiver that is 'stated with clarity and accompanied by supporting data,' such requests 'are not subject to perfunctory treatment, but must be given a hard look.'*

162 F.3d at 1224 (quoting *WAIT Radio*, 418 F.2d at 1157) (emphasis added). The *BellSouth* Court went on to note, however, that

> an agency that is required to give a 'hard look' at a waiver request is not necessarily required to have an existing waiver policy for all of its rules. The 'strict adherence to a general rule may be justified by the gain in certainty and administrative ease, even if it appears to result in some hardship in individual cases.'

*Id.* at 1225 (quoting *Turro v. FCC*, 859 F.2d 1498, 1500 (D.C.Cir.1988)). And, the requestor of a waiver "assumes a 'heavy' burden because 'an agency's refusal to grant a waiver will not be overturned unless the agency's reasons are so insubstantial as to render that denial an abuse of discretion.' " *Omnipoint*, 213 F.3d at 723 (quoting *Mountain Solutions, Ltd. v. FCC*, 197 F.3d 512, 517 (D.C.Cir.1999) (quotations omitted)).

The ABA asserts that the FTC's April 8, 2002, Opinion Letter was arbitrary and capricious by failing to even consider the

Commission's inherent *de minimis* authority to provide an exemption to the GLBA, in light of the FTC's grant of such an exemption to institutions of higher education that comply with FERPA. ABA Mem. at 34–42. The ABA's request for an exemption from the GLBA's privacy provisions was essentially a request for a *de minimis* exemption. This is a fair interpretation because the ABA requested an exemption from the GLBA's regulatory scheme based on the fact that attorneys were already subject to state ethical regulatory schemes. *See* ABA Compl. ¶ 19 ("The ABA, as well as state bar associations, argued that ... attorneys should be exempted from, or deemed to be in compliance with, the GLBA because the ethical strictures of every state jurisdiction already require attorneys to protect the privacy and confidentiality of client information."). However, in response to the exemption request here, the FTC's April 8, 2002, Opinion Letter denying the request fails to even address the utility of subjecting attorneys to the GLBA's regulatory scheme when the practice of law, specifically, the confidentiality of client information, is already regulated by the states. *See* ABA Compl. ¶ 20 ("[I]t did not mention, much less address, the fact that lawyers are already subject to privacy and confidentiality statutes and regulations in every state. The FTC provided no explanation or reasoning for its opinion that lawyers practicing law are covered by the GLBA and should not be exempted.").

The *Marshall County* Court commented that the grant of an exception by an agency to some and not to others identically situated constitutes arbitrary and capricious agency action. 988 F.2d at 1224. In this case, the ABA asserts that in the face of having granted institutions of higher education that comply with FERPA an exemption from the requirements of the GLBA, the FTC's refusal to grant attorneys a similar exemption was an arbitrary and capricious action, as the two requests were "analytically similar[.]" ABA Mem. at 35–36. In the FTC's Final Rule implementing Title V of the GLBA, it explained why it was granting such educational institutions that comply with FERPA an exemption, stating that

> such entities are subject to the stringent privacy provisions in [FERPA], 20 U.S.C. § 1232g, and its implementing regulation, 34 CFR part 99, which govern the privacy of educational records, including student financial aid records. The Commission has noted in its final rule, therefore, that institutions of higher education that are complying with FERPA to protect the privacy of their student financial aid records will be deemed to be in compliance with the Commission's rule.

Privacy of Consumer Financial Information, Final Rule, 65 Fed.Reg. 33,646, 33,648 (May 24, 2000). It is clear from the FTC's Final Rule that it was exempting institutions of higher learning that comply with FERPA from the GLBA's privacy provisions because such institutions were already subject to a regulatory scheme under FERPA that provides similar confidentiality protections as the GLBA. As this Court has repeatedly pointed out above, the ABA proclaims that with respect to the practice of law "[e]very single state has, and strictly enforces, laws and regulations that prohibit disclosure of a far broader range of client information, providing greater protection to clients than the GLBA." ABA Mem. at 37 (citing ABA Compl. ¶¶ 24–25). The basis for the ABA's exemption request was strikingly similar to the reason the FTC exempted educational institutions that comply with FERPA from also complying with the GLBA, as both are subject to stringent

regulatory schemes that already protect the confidentiality of clients'/students' information. As this Court explained above, *de minimis* exemptions are typically granted when "the burdens of regulation yield a gain of trivial or no value." *Envtl. Def. Fund*, 82 F.3d at 466 (quoting *Alabama Power*, 636 F.2d at 360–61). Having previously granted a *de minimis* exemption request on the basis that educational institutions were already subject to a stringent regulatory scheme, the ABA's exemption request warranted, at the very least, similar consideration from the FTC. For the FTC not even to consider, much less take a "hard look" at the ABA's *de minimis* exemption request, appears to be arbitrary and capricious agency action. *See State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' ") (citation omitted); *Panhandle E. Pipe Line*, 890 F.2d at 439 (holding that an agency "must engage in reasoned decisionmaking, taking a hard look at the salient problems before it. . . ."). Therefore, this Court concludes that even if the GLBA's privacy provisions are applicable to attorneys, the Court would nonetheless be unable to dismiss the plaintiffs' complaints because the FTC's failure to consider the *de minimis* exemption request appears to constitute arbitrary and capricious agency action.

### IV. *Conclusion*

For the aforementioned reasons, the Court will deny the defendant's motions to dismiss the complaints pursuant to Rule 12(b)(6). This is because it does not appear that Congress intended for the GLBA's privacy provisions to apply to attorneys. In addition, it also appears on

the record now before the Court, that the FTC's failure to provide sufficient reasoning to support its interpretation that attorneys are subject to the GLBA, raises concerns regarding whether the decision amounted to arbitrary and capricious agency action. Finally, even if the GLBA is applicable to attorneys engaged in the practice of law, it appears that the FTC failed to consider whether attorneys are entitled to a *de minimis* exemption under the GLBA, which if proven to be the case, would also amount to arbitrary and capricious agency action.[28]

---

**28.** An Order consistent with the Court's ruling accompanies this Memorandum Opinion.